Good morning. You may proceed. Good morning. Thank you, Your Honor. May it please the Court, I represent the appellant defendants here. In 1938, the Sturgis Rally started. And about 50 years later, in 1987, the appellee predecessor in interest obtained rights to a narrow, unregistered logo, the Black Hills Motor Classic logo. And that logo has no less than eight features that comprise the overall impression of the logo. The plaintiff told the trademark office at the time of prosecution that the word Sturgis, which shows up as one of those eight features, wasn't functioning as a trademark. That was in 1995. That that word Sturgis indicated to consumers the event and the town. Now, by 1987, hundreds of others had already been using Sturgis products. They were selling products and the record is replete with evidence of that. So the case is really about this. The very narrow logo that was obtained in 1987 and SMRI's efforts to expand out to something that they weren't entitled to, namely the Sturgis trademark registration. In the words of one of SMRI's witnesses, Jim Burgess, they were going to get that mark no that's exactly what they did, but there's no justification for it in the record. So 14 years after they got the logo, they filed an intent to use application for Sturgis with full knowledge that hundreds of others had been using Sturgis for two decades before. Promptly after they filed their registration, Good Sports Sturgis and Sturgis Motorcycle filed trademark opposition and they submitted declarations establishing the prior use by they and many others on dozens of products going back to the 70s and the 80s, millions of dollars worth of sales of Sturgis products. The parties fought for about 10 years in the trademark office and then SMRI got tired of the fight and cut sweetheart deals with their two opposers. One of them, they gave a perpetual royalty-free license and the other one they gave a cut of the future royalties and the ability to control sub-licensing going forward so that they could limit their competition. And Jerry Berkowitz, who was the gentleman who got that, testified that's one of the reasons why he settled, because he wanted to control competition. So the opposition ended with those deals. The lawsuit was filed shortly after, but the facts never changed. And by that what I mean is at trial, Mr. Berkowitz and Mr. Burgess from those two companies came in and said, hey, what we said all along is still true. We were first. We were before the chamber and SMRI really wasn't the first to use the Sturgis mark. Now it's important to note that those folks are affiliated with SMRI now and they're still saying that SMRI was not first. Not one witness testified at trial that SMRI had an earlier use. So SMRI in their briefing kind of papers over this lack of evidence by referring to their marks actually because it allows them to pull evidence from say the logo and say that it applies to the Sturgis mark when in fact one has nothing to do with the other. The confusion that's interjected by that kind of tactic explains why the verdict is the way it is, even though there's no evidence to support it. SMRI is entitled to the narrow logo and not much else. And so I'm going to address my remarks to two things here. One is the lack of evidence of secondary meaning on the marks and the second is the lack of evidence to support the finding on the logo. Now with respect to the Sturgis mark, it's a registered mark, but it was registered under 2F, which means that it only gets the presumption of secondary meaning upon registration in 2011. But there was an accusation of infringement five years before. So much like the case in Aromatique, the presumption goes away. If you accuse of infringement before registration, you don't have the benefit of the presumption. That's what happened here. And there's a bunch of other evidence that rebuts the presumption as well. But the net effect is SMRI had to come in with evidence of secondary meaning and they failed at that. At page three of our reply brief, there's a chart. It sets forth all the evidence of prior use by others. And as I said, it's dozens of products, hundreds of vendors, millions of dollars back to the 70s and 80s, predating any evidence that SMRI ever submitted at trial. No witness said otherwise. Every witness said that that was the case. Nine of the witnesses who corroborated that view of the facts were SMRI board members or affiliates. So when we look at the post-trial order from the district court, there's no evidence suggesting that SMRI was earlier. What he says is, well, the evidence came in, the plaintiff said this, the defendant said that, and the jury gets to decide. But he didn't justify the verdict. Is the timing relevant to the secondary meaning? Are you conflating a secondary meaning is determining whether, based on consumer perception and a number of other things, whether it has that distinctiveness? Well, they have to show secondary meaning before first use by others. And so the timing is critical here. So you're focusing more here on the timing to defeat that. Right. And what SMRI will say is we had millions of dollars of sales and revenue by our licensees and royalties. But that evidence really, if you take a close look at it, the evidence is 2000 and later for SMRI. So while they spent a lot of money, it was too late. And I think if you look at the brief on appeal, if you look at our reply brief, we delineate their evidence quite clearly. And all of the evidence for Sturgis is 2000 and later. All of it. Is that the focus, then, of your argument really is timing on secondary meaning? That's where you disagree with the finding. Yes, that's the issue. So if we look at the circumstantial evidence, there is evidence of royalties and revenues by licensees and so on and so forth. But the fact inference from that. Can they get an inference of secondary meaning? They can. The case law supports that. But it has to be a reasonable inference. And here it's not reasonable for three reasons. One, they have no, forget about long period of substantially exclusive use, they have no period of substantially exclusive use. And without that, they can't get the presumption. The second thing is, as I just mentioned, the evidence of the royalties and the third issue, and this kind of drives it home, trial exhibit 541 is a license, an SMRI license to Sturgis. It is a February 2000 license and it is the first license to Sturgis in the record. There are no licenses before 2000 to Sturgis. So it stands to reason that they wouldn't have had revenues for Sturgis until after that. They just don't have evidence to support this finding of validity because there's no secondary meaning. The same is true in spades for the two common law marks, Sturgis motorcycle rally and Sturgis rally and races. Since they're common law marks, they don't even enjoy the presumption of secondary meaning. There isn't evidence that they had a long and exclusive use for those marks either. The court cites to some evidence that's pretty thin, but take it on behalf of SMRI, 1999 and 2002 are the dates the court says. But the evidence is, first of all, Sturgis motor classic, which my clients used, they started using in 1998. It beats both of those dates. Sturgis rally, they used in 1998, that's trial exhibit 785B. Bike week, 1998, that's trial exhibit 703. Sturgis had been used back into the 80s. So again, they don't have long exclusive use. They have no evidence of what consumers thought about these marks. There just isn't evidence to demonstrate that anyone viewed these as a single source identifier. The long and exclusive use is just one factor though, correct? Yeah. And that sort of was an issue with the jury instruction. But Zion read the way the jury was instructed on that issue. That's one thing that they can consider. Yeah. I think the law is that there can be de minimis use by others, but there has to be some period of substantially exclusive use. You can't come in after the rest of the public has been using marks for 10, 15 years and then co-opt that and establish secondary meaning. Unless the use is de minimis and the evidence doesn't support such a finding here. Briefly, I want to just speak about the logo. The legal standards here are, you have to compare the overall impression of the mark to the accused use. And it's legal error to focus on individual features. But that's exactly what the court did in the post-trial order. And that's what SMRI does on appeal here. If we look at docket 420, which is the court's order on the JMOLs at pages 14 to 15, that's where he talks about this issue. And the only thing he says is this. He says, motor classic and Sturgis rally, which are in the logo are substantially indistinguishable from Sturgis motor classic and Sturgis rally. That is the sum total of his to use were disclaimed apart from the mark during prosecution. So you're not even supposed to be looking at those apart from the mark as a whole. So that's the first error he made. The second error is he's clearly just looking at individual features. There's no discussion about other similarities, other differences, the fact that more than half of the eight features are absent, that the size, the font, the arrangement, the perspectives are or that the there are additional features that were added. So that's what the court said supported the jury verdict. And it's legally incorrect. There's nothing else that the court said the jury could have relied on on appeal. Appley doesn't identify much else. The best they can come up with. And we put pictures in our reply brief where some T-shirts that just say the same thing, Sturgis motor classic, that's it. And they say that's a counterfeit of the logo. Well, they don't look anything like, and then the only other piece of evidence is that shot glass. And we detail that in our brief, our moving brief. There are scads of differences. And what they do again is they focus on just the features that they want to say are the same with no, but you've got a jury verdict on that one, correct? So it seems to me that that's going to be a tough one in the jury gets to look and do exactly what you're, you're arguing to us now and sort of just decide is that, is that substantially similar? Is that, um, is that something that, that, that violates the counterfeit? Sure. You have to give due course to what the jury did and you can't second guess them, but are you speaking of the infringement claim now or the counterfeit claim? Uh, this is the, the, uh, actually both. I don't think that that shot glass can, it is not as, I'm sorry, the shot glass is not a counterfeit and the issue there would be infringement. And I guess what I would say to your question, judge Kelly is, um, yes, we have to give deference to the, to the jury verdict. But the fact of the matter is six of the eight features are not present in the shot glass. And as a matter of law, if you get down to that level of granularity, you're looking at individual features and there's frankly no other way to, to look at it. You are not looking at the overall impression. So with that, I'd like to reserve the rest of my time. Very well. Mr. Sneed. Good morning. You may proceed. Good morning, Your Honor. May it please the court. Jason Sneed and Megan Srokas here for the plaintiff below Sturgis Motorcycle Rally, Inc. The, the appellee and cross appellant in this case. Defendants Rushmore Foto and the Neimans make their living selling geographically themed merchandise throughout the Western States. They sell South Dakota t-shirts, um, Deadwood shot glasses, Wyoming ball caps. But when in 1999 they sought to use Sturgis on merchandise in connection with motorcycle rally goods, where did they go? They came to the Sturgis Chamber of Commerce, the source of authentic which was approved and they entered into a contract with the Sturgis Chamber, the license agreement in which they solicited for the right, they obtained the right to use the Sturgis composite design mark, the logo in connection with postcards. And in that contract, they acknowledged that the Sturgis Chamber of Commerce was the owner of the Sturgis Rally and Races trademark. That was in 1999. What is your evidence of ownership of the unregistered marks? You know, the ownership of the unregistered marks arises out of the use by the Sturgis Chamber of Commerce and, and, and its successor and interest, my client, SMRI. What's the evidence for that? The evidence is extensive. The, the, the trademark, the, the logo was used as early as the mid 1980s and the Sturgis Chamber of Commerce started licensing the use of Sturgis Rally and Races and other designations throughout the late 80s and 90s. On what basis? I mean, simply claiming the right to license surely isn't enough by itself, is it? The right to license expressed in, in, in many, many license agreements in their use to promote, organize, and market the Sturgis Motorcycle Rally for many years. The city of Sturgis, in fact, is a licensee of my client and its predecessor. So the city licenses the Sturgis trademark. The city of Sturgis licenses the Sturgis trademark. As to whether there's such a thing as an ownership of this rally, is that, do we know if that's a reasonable question? Your Honor, the rally is certainly organized and administered. An event, isn't it? It's a happening. It is a happening, yes, sir. Very much so. And, and like other festivals and events, there are activities that happen around where the event is centrally located. The city goes to great pains. We heard the testimony of Daniel Ainslie, the city manager at trial, about the extensive activities the city undertakes to put on the rally from arranging. It has to do that as a matter of providing municipal services, doesn't it? It does, and it. How's that evidence of ownership of either the rally or the products of the rally? I think it's a semantic issue on ownership of the rally or the event, but what my client owns are the trademarks under which goods are sold. I understand that, but it. Is there a functional equivalent of a, this could have entered the common domain at some point in the history of the rally that the public sort of owns it? The public is entitled to use this? The public certainly is able to use the Sturgis term in a geographic, purely geographic sense. Businesses located in Sturgis, such as the Sturgis Coffee Company, can use Sturgis to denote the geographic location of their business. Companies can use the Sturgis term to refer fairly to the event, such as in a magazine, they're doing an article on the Sturgis rally. But where my client draws the line is when Sturgis is used in an infringing manner to sell motorcycle rally goods to the public. My client has over many years, $70 million of sale of licensed goods, over $5 million in royalties received, use over several decades. Brings me to the question I was going to ask. Maybe this is the key to it. As Mr. Opponent said, while they spent a lot of money, it was too late. Isn't that the key to this case? You're just late to the, to the event as it were. It's one of the issues they raise and all these issues were presented to the jury, your honor, over a two week trial in 2015. And what we established was that under their aromatique scenario, yes, we have a presumption of validity in our Sturgis registration from the date of registration. But we sought to prove and did prove secondary meaning in the Sturgis marks as associated with the Sturgis Motorcycle Rally, Inc. and its predecessor and interest, the Chamber of Commerce going back many decades. Now we would say as far as the defendants are concerned, we only had to establish distinctiveness in the Sturgis mark prior to 2006. Their use prior to that date, the evidence did not show any use to my client's rights. What happened in 2006 was they put up a banner in Main Street and Sturgis that said, officially licensed Sturgis products sold here. My client sent a cease and desist letter informing them of its rights to the Sturgis composite design mark, informing that five years before they had filed an application to register Sturgis and that that mark was distinctively associated with my client and informing them and reminding them of their licensee estoppel and licensee obligations, their acknowledgement of Sturgis rally and races as my client's mark. Now at trial, they would refer to the mark Sturgis rally and races as the functional equivalent of Sturgis. Now if it's the functional, if Sturgis mark is the functional equivalent to a mark to which they have taken a license, then they are bound by licensee estoppel and prohibited from filing a contest as to the validity of my client's rights. Sent the cease and desist letter in 2006, the banner came down and the store closed. And then what happened over the winter? In their 2007 catalog, they launched a new brand, unbeknownst to the Sturgis chamber at the time, and that new brand was Sturgis Motor Classic, or its abbreviation SMC. And we see in their 2007 product catalog and on their product hang tags, those items are littered with designations Sturgis Motor Classic, Officially Licensed Sturgis, and Authentic Sturgis, which are false designations and false advertising. So my client brought suit, SMRI brought suit after it acquired these rights in 2011, and four years later this matter came on for trial. And the jury found every single claim in my client's favor, that it had protectable registered trademarks that were infringed, that the defendants engaged in false advertising by their sale of quote officially licensed Sturgis products, that they engaged in bad faith domain name registration under the ACPA, and that they diluted the famous Sturgis mark, which was associated with my client. After trial, however, and the jury awarded my client a damage award of $912,000 in damages. After trial, however, the case went off the rails, frankly, and the district court unfortunately entered a post-trial order granting the motion was granted in error in many ways. Not the least of them, that a defendant must come to the court in equity on the defenses of latches and acquiescence with clean hands. Now defendants who have been found liable for falsely advertising, liable for committing willful trademark infringement, and the jury verdict form is a special verdict form that has boxes to be checked if the infringement was willful, and the jury checked those boxes that defendants infringement was willful in each case. So defendants who willfully infringed, falsely advertised, and committed domain name cyber squatting in bad faith, which is an element of that claim as per the jury instructions, then come to the court in equity, and the court improvidently granted their post-trial rule 52 motion. Now we can, so defendants cannot come to court in equity when they lack clean hands, and we would say that the defendants clearly lacked clean hands by the jury verdict. Moreover, we can find no example where a district court following a jury trial has even entered a rule 52 order to enter additional findings of fact. We find no example of that. In fact, rule 52 exists to allow district courts to enter findings of fact when there is no jury or when there is a merely advisory jury. How would you have, how do you think the district court should have handled the equitable defenses? The court should have refused to enter a rule 52 order. The court should have not entered new factual findings as to latches and acquiescence that it did, and I'll discuss each of those in a moment. Um, the court should have determined that the defendants come lacking clean hands and refuse them in equity entirely. I understand the result that you're, you're seeking, but as a procedural matter, you're saying that rule 52 is not the proper way to do this. What was the proper way? Oh, the proper way would have been for the defendants to have posed jury instructions or elements on the jury verdict form to address the factual underpinning for the equitable defenses they sought. For example, there was no jury instruction posed by the defendants. In fact, they decided not to submit one on the issue of did SMRI unreasonably delay in bringing suit against Rushmore Photo. They had every opportunity to do so and chose not to. They can't then come to the for the court to make that finding is unreasonable to lay a common law defense to the to the to the plaintiff's action. Or is it just an equitable defense? Well, they characterize it as an equitable defense. It can be a part of a fair use defense, I would think of trademark infringement, and they spoke. That's what I'm wondering. How does it become a jury question in the context of the main action? The jury was instructed on the issue of fair use and fair use was an issue that was tried. How does how does unreasonable delay become a part of fair use of the fair use inquiry? It could become a part of the fair use inquiry in that as part of seeking to establish that the the trademark owner has not protected its marks or enforced its marks appropriately or within as it is bound to do as a trademark owner. But my client in fact brought this case against Rushmore Photo. It perceived that it had to act because of their blatant infringement and false advertising with respect to my client's rights. Is it clear law that the jury's fact on the on a legal claim stop out the the judge from from from not from from using some contrary factual basis with respect to adjudicating the equitable claims? Is that right? Yes, we would say in fact that that as far as the factual issues or the factual issues that go into equitable defenses are concerned, those issues are jury issues in a jury trial and that the but to the extent they are, is it clear law that those findings are binding on on the district judge when essentially he's sitting as a chancellor ruling on equitable matters? Is that clear law? Yes, your honor. And I believe we've we've cited those cases in our briefs. I know you did. I'm asking you if they're clear law. If it's clear law. I'm just curious. Yes, your honor. We understand it to be clear law. Now, some of these issues restrain on equity, really. But I mean, if it's law, then we do it. Well, to the extent there are combined legal equitable issues or the factual issues under support equitable issues, those factual findings need to go to the jury and the defendants elected not to take those to the jury or they took them to the jury and they were they do not have to be submitted to the jury on the legal claim. There may be allow me to address, if you would, your honor, in the latches and equity actions issues that the court found in this case, because both of those were were based on clearly erroneous district court findings in that post trial order. Assuming that that that this matter was properly before the court, what was the matter with the What exactly was the matter with the court's decision with respect to latches? Yes. With respect to latches, your honor. Latches is, of course, unreasonable delay. And and the court, what the court did with respect to latches is that the court said in his post trial order, I find the testimony of Paul Neiman to be credible on issues about Rushmore's Now, he found the testimony of Mr. Neiman to be credible, but the jury did not. In fact, Mr. Neiman was repeatedly cross-examined at trial on these issues of his claims of prior use of the Sturgis mark in a manner inimical to my client's trademark rights. Some of the use that he claimed was made was geographic use. It's the kind of postcards of the city of Sturgis or of the hillside behind the city that has Sturgis on it. That is not motorcycle rally goods. It's the kind of some of the use that he testified to trial that was inimical to my client's rights was, in fact, licensee's use. Rushmore Photo made a practice of selling other companies goods such as the goods of the Sturgis Chambers licensee, Turkey Graphics. Some of the use in his evidence that we found even was evidence of sales of the very postcards that Rushmore Photo had directly licensed from the Sturgis Chamber in 1999. So far from being evidence harmful to my client's rights, some of this was inconsequential or even helpful to my client's rights. So the jury found his testimony uncreditable. Didn't you at some point of these proceedings during the opposition to the Sturgis mark, your group say that there had been widespread use? I think those are the testimony of others, and we addressed that at trial as well, Your Honor. But if there was widespread use, what was the basis of your client's claim for exclusive use? Again, we need to consider the context of that use. Some of the use testified that was clarified with the testimony of Mr. Burgess and Mr. Berkowitz at trial was that they referred to 700 vendors having used Sturgis in their opposition proceeding declarations. But as we had them on the stand and asked them, they said they got the 700 vendors number from city rally statistics. These are just numbers of vendors. This could be a vendor selling chicken on a stick or a vendor offering dry cleaning services. What was your evidence that shows that consumers identified Sturgis as coming from a single source? Yes, Your Honor. Unfortunately, my client, a non-profit, could not afford survey evidence testimony, but it put on a great deal of other evidence that consumers associated Sturgis with the Sturgis Chamber and SMRI, including a lot of look for the tag advertising, billboards along I-90, extensive licensing in which companies large and small such as in contract that my client owned the rights to the Sturgis mark, licensing revenues where other people are selling tagged licensed merchandise that amounted to over $70 million in licensed goods sales. Some of that testimony, it seemed to me, might be characterized as establishing or standing for the proposition that people associated the goods with the Sturgis rally rather than with a particular source. Isn't that correct? I think, again, we're... That's a different kind of thing. We are trying. We need to be careful about that because that is a different kind of thing. It would be, do people associate a good with the Super Bowl or the NFL? Sometimes the source is not a known particular source, but it is known to be a single source from where these goods originate. I agree. You don't have to know the source, but it has to be, as I understand the law, has to be associated with a single source. That's right. And that's what we say we did prove to the jury, and this was a hotly contested issue. Each of the defendants' attempts to show the invalidity of any of the Sturgis marks was rebuffed. And so there's even a mistaken comment of the court as to acquiescence where the court treats the company Sturgis Bike Week, Inc. as a, quote, predecessor and interest to my client, SMRI. Well, that is not the case at all. In fact, Sturgis Bike Week, Inc. is another company that Sturgis Chamber took to court back in the early 2000s and obtained a consent judgment and a preliminary injunction against it because it was selling Sturgis Rally and Races licenses without permission after its own contract had been turned down. And so eventually they settled with that company, and that was resolved, and those rights that were claimed by Sturgis Bike Week, Inc. were purchased. So far from being a predecessor and interest, as the district court says wrongfully, erroneously in its report, the acquiescence has no foundation based on the state that SMRI had consented to the bad conduct of Rushmore Photo and his allies. I keep coming back to my common domain thing that apparently has no legal significance. I guess as a practical matter, why should one group be able to profit to the exclusion of others from all of the money generated by what some of us would not consider a socially beneficial event unless you have a beer distributorship or a motel ownership or somehow it's so encompassed within the local culture that it's a matter of civic pride. And those of us who live in the eastern side of the state are glad when it's over so we can drive on Interstate 90. I understand, Your Honor. This goes to the essence of trademarks in general is that while a geographic term certainly is available as a geographic term, others can appropriate a geographic term for their use and ownership in connection with certain goods and services like my client has done over many years of trial and effort. Other examples include Iditarod or Talladega, Alabama for country music, Chicago for soft rock. Did Hollister, California ever attempt to do that as a result of the, what was the movie? Well, anyway, it's back in 1947, the big Life magazine spread. Well, you're too young to remember. I'm aware of the Hollister brand, Your Honor. I'm not so familiar with the history. That's a different thing, I found out. It is. Well, I shouldn't digress from it. Apparently no one has yet tried to monetize Comstock, but I'm not sure. Not to my knowledge, Your Honor. Well, we thank you for your argument. Thank you. And we'll hear from Mr. Chadwick in rebuttal. Thank you, Your Honor. I want to address a couple of the legal issues first before turning to the equitable issues. A lot of the argument that my opponent made centered around the 1999 license to the logo, and he argued estoppel. It's important to note that the appellee did not file a Rule 50b motion on equitable estoppel. It was waived. It's not something that's properly to be considered here on appeal. The testimony was clear to address some of the issues that Your Honors ask. Nobody owns the rally. And in fact, the testimony was also clear that what people associated these marks with was the rally, not SMRI, and in fact, not some faceless, nameless source. It was the rally. It was the event and the town. And they said the same thing. Remember, in 1995, when they were trying to get the logo, they said that Sturgis to the consuming public is indicative of the city and the event, not a source identifier. And now they want to have it different because they want to have a broader licensing campaign to control over all of the money and how it's distributed and who gets it. That's what this is all about. One final comment. The notion that my client didn't have any use of Sturgis before 2006 is not supported by the record at all. There's clear evidence that they sold both in the 1990s to Sturgis Bike Week, to the Chamber of Commerce, Sturgis Goods. So the fact that Mr. Sneed said Rushmore wasn't doing anything until after 2006 just isn't true. Now on equity, to answer your question, Judge Arnold, here's what's clear. If you have a right to a jury trial and there are common issues of fact, the jury gets those. It doesn't mean the court doesn't get to decide things in equity. But when the jury makes fact findings, the judge is bound by those. Here, there was no right to a jury trial on the equitable issues and the plaintiff didn't ever ask to have it. Were there common facts? There were not common facts. The issue on laches and acquiescence is inexcusable delay, prejudice, knowledge, and affirmative act with consent. None of those are elements of any of the legal claims. And the appellee never identifies, in two briefs, never identifies what common issues there were. They just say that the but there was no reason to submit it to the jury. In the event that they didn't, so there's no estoppel. Correct. And the issue of submitting the equitable issues to the court came up in the pretrial charge conference. And the court, Judge Viken has been around for a while, he knows what he's doing, and he even said, with regard to their equitable estoppel, or their licensee estoppel argument, he said, I'm not giving that to the jury, but if a fact issue comes up and we need to instruct, I will. And then we never did because there were no fact issues. The argument about, I want to say this as well, the only argument that SMRI made post-trial about unclean hands was willful trademark infringement. That's it. And it's pages five to seven of docket 371. And Judge Viken identified that in his GMOL order. They weren't talking about anything else. Now they seem to want to talk about anti-cyber squatting and other things. But the argument post-trial was he couldn't do unclean hands because of willful infringement. And what they're asking for here is a bright line rule. If you have willful infringement, you don't get equity. There's no Eighth Circuit precedent for that. And in fact, as contrary to the Supreme Court precedent, the Keystone case, it says no rigid formulas. So the court has the, as long as it's not preempted because of common issues of fact, the court does get to decide these issues. And even if the court were to find unclean hands, 15 USC 1117, which is the damages aspect of the trademark law says that damages are always subject to principles of equity, always, even if there's a willful violation. And that is explicitly laid out in the statute. So even if he says unclean hands, he can still limit the damages or get rid of them. And in fact, we asked the court to do that. At docket 352, page 13, we cited the 3M case here from the District of Minnesota, Judge Thunheim. And he said, although that was in a different frame, it was a summary judgment determination. But he said, even if you don't prove latches, the damages can still be limited. That sentiment is also set forth in the Gafford case that we submitted yesterday afternoon as a supplemental authority. In that case, the court said, even if I found a complete bar, I would limit the damages before the verdict because you waited so long to bring this lawsuit. So with that, I have nothing else unless you have questions. Very well. We thank you for your argument and for the arguments on both sides. The interesting case with a lot of issues and it's now submitted and we will take it under consideration.